NORRIS, ADMINISTRATRIX *v.* MISSISSIPPI COUNTY
ELECTRIC COOPERATIVE, INC.

4-9700                                          246 S. W. 2d 561

Opinion delivered March 3, 1952.

*Elbert S. Johnson,* for appellant.

*Wm. S. Rader, Jr.,* and *Reid & Roy,* for appellee.

GRIFFIN SMITH, Chief Justice. The court directed a
verdict against Gladys Poston Norris, who as adminis-
tratrix had sued for the death of Arthur Poston. The
only question is whether there was substantial evidence
for the jury's consideration. Conversely, the inquiry is
whether the court was correct in holding as a matter of
law that there was no proof showing actionable negli-
gence.

Poston was killed at 12:30 a.m. January 17, 1951,
when he walked into a sagging transmission line carrying
7,200 volts. The defense was that the Mississippi County
Electric Coöperative, Inc., whose line caused Poston's
death, had constructed and maintained its system in
appropriate manner and that third persons caused the
line to dip to a point three or four feet from the ground
when they thoughtlessly removed clamps or shackles to
which a guy wire was attached in support of a pole on

which the wires were strung. A truck owned by a resident Mexican had slipped or skidded from a roadway, with the result that the owner and those assisting him removed the clamp, allowing the light pole to tilt sufficiently to create the hazard resulting in Poston's death. Recovery was predicated upon allegations that the guy wire was improperly placed, and the company was negligent in its method of inspection.

The Coöperative distributes electricity over 982 miles of lines. It purchases wholesale from Missouri-Arkansas Power Company, and connects with that corporation's sub-station at Dell. The coöperative system was organized in 1947 and construction was begun in October of that year. The lines were built with employed labor rather than by contract.

H. C. Knappenberger, general manager, testified that when an electric line is built "you have to use diligence all the while—you've got to watch to see that it is all right." He thought that perhaps the line causing trouble had been inspected once a month. The witness had seen it twice during the summer and once in November. Customers read their own meters, write the readings on a company-supplied card, return it, and then receive a bill for the service rendered. Each card carries a telephone number showing where emergency calls may be put through. In the controversy here the company was not informed that the line was sagging until after Poston was killed. The first knowledge that anything was wrong came about two o'clock—shortly after the tragedy had occurred.

It is not necessary, in this opinion, to determine whether the company was negligent in maintaining the pole here discussed—a pole supported by a guy wire running to the ground; nor do we consider whether the construction should have been according to a pattern better planned to ward against gratuitous interference.

R. W. Norman, who works with the engineering division of Rural Electrification Administration, testified that the construction standard was good, and that it met

the Federal government's requirements. But he also answered, when asked whether it was customary to put guy wires at the most practical point, or at the safest point, "the cheapest and the best." Guards for guy wires were not used. Norman also testified that in certain instances a pole-key is used, but on the type under discussion a pole-key could not be used. Specifications called for 35-ft. poles set six feet in the ground. The witness had not checked to determine if the pole to which the down guy wire was attached had been set to the approved depth.

Conceding, as the undisputed proof affirms, that the Mexican truckowner and his helpers removed the clamp, and that this occurred at the earliest time suggested by witnesses for appellee—"about" two o'clock in the afternoon,—we are met with testimony of Patsy Coleman who says that the wires started sagging about one o'clock the day before Poston was killed. She did not elaborate upon the extent of this sagging, except to say that the wires came down gradually. It was almost night when she last saw them, and at that time they were about a foot above the ground. The discrepancy between appellee's contention that the lines went down after or near two o'clock when the clamp was removed, and Patsy Coleman's statement that they began sagging about one o'clock, was not cleared on cross-examination except to draw from the witness a repetition of her assertion that the wires gradually kept getting lower, and the last time she saw them was just before dark.

It seems likely that the trial court overlooked these differences in time, and that the uncertainty came about when the motion for a directed verdict was argued beyond the jury's presence. Counsel for the defending company said: "The courts hold that an electric distribution company is not required to inspect its remote rural lines every day. This being true, there was not presumption of knowledge of the condition on this line through lapse of time because, taking the testimony most favorable to the plaintiff, the line sagged dangerously by one o'clock. Other witnesses placed it much later. Poston

met his death not later than one o'clock a. m. twelve hours later."

But the point lost sight of was that the clamp was not removed until two o'clock or later during the afternoon preceding Poston's death, and if Patsy Coleman's testimony is true the cause was not the removal of the clamp; or, perhaps, to be more exact, the cause most strongly stressed by appellee has not been fully sustained by the element of time, thus leaving an interim for consideration of the fact-finders from which permissive inferences might be drawn.

We also think that testimony such as was given by Jerry Flanders, a professional engineer who believed that the pole and its attachments were not according to an approved safety pattern, raised another factual issue. For this reason some of the evidence relating to the installations (testimony other than that of Flanders) has been referred to.

Judgment reversed and cause remanded.

Mr. Justice WARD dissents.